683 F.2d 673
 10 O.S.H. Cas.(BNA) 1700, 1982 O.S.H.D. (CCH)
P 26,112
 CARLYLE COMPRESSOR COMPANY, DIVISION OF CARRIER CORPORATION,
Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, and
Raymond J. Donovan, Secretary of Labor, Respondents.
 No. 793, Docket 81-4129.
 United States Court of Appeals,
Second Circuit.
 Argued April 8, 1982.
Decided June 21, 1982.
 
 W. Scott Railton, Washington, D. C. (Paul L. Landry, Daniel A. Masur, and Reed Smith Shaw & McClay, Washington, D. C., on the brief), for petitioner.
 Judith N. Macaluso, Atty., U. S. Dept. of Labor, Washington, D. C. (T. Timothy Ryan, Jr., Sol. of Labor, Frank A. White, Assoc. Sol. for Occupational Safety and Health, Allen H. Feldman, Counsel for Appellate Litigation, U. S. Dept. of Labor, Washington, D. C., on the brief), for respondents.
 Before TIMBERS, KEARSE and PIERCE, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Petitioner Carlyle Compressor Company (Carlyle) seeks review of an order of the Occupational Health and Safety Review Commission (the Commission) which upheld a citation by the Secretary of Labor (the Secretary) for a serious violation[1] of §§ 5(a)(1) and (2) of the Occupational Safety and Health Act (the Act), 29 U.S.C. §§ 654(a)(1) and (2) (1976).[2] We deny the petition to review and affirm the final order of the Commission.
 
 I.
 
 2
 Carlyle, a division of Carrier Corporation, is a New York corporation with its principal place of business in DeWitt, New York. It manufactures air conditioning compressors.
 
 
 3
 On March 27, 1979, a compliance officer of the Occupational Safety and Health Administration (OSHA), conducted an inspection of the Carlyle plant. On March 30, 1979, he issued a citation and assessed a $300 penalty against Carlyle for failing to provide a guard on a Warner & Swasey cylindrical grinder to protect the operator of the machine and other workers from the hazard created by flying shafts from the machine. Carlyle contested the citation.
 
 
 4
 On May 14, 1979, the Secretary filed a complaint which, as amended, alleged violations of OSHA's general machine guarding standard, 29 C.F.R. § 1910.212(a) (1) (1981), and, alternatively, the general duty clause, 29 U.S.C. § 654(a)(1) (1976). An Administrative Law Judge (ALJ) affirmed the citation but reduced the penalty to $150 in a decision and order dated May 4, 1981. The Commission denied Carlyle's petition for discretionary review and adopted the ALJ's decision as its final order on June 3, 1981. This petition to review under § 11(a) of the Act, 29 U.S.C. § 660(a) (1976), followed.
 
 II.
 
 5
 The cited machine is a grinder that performs a step in the production of P-eccentric shafts. The machine operator places a cam locking device, known as a driver dog,[3] on the motor end of a shaft. The driver dog holds the shaft in place by means of screws tightened against the shaft. The operator then places the shaft in the machine and, after checking the position of the device, activates the grinder's centering device. After some checking, the operator pushes two buttons to activate the grinding cycle. A pin engages the driver dog and turns it and the shaft at an increasing speed. The grinding wheels gradually engage the shaft, which is timed at a lower speed controlled by the driver dog.
 
 
 6
 The OSHA compliance officer determined that there was a danger that shafts could be thrown from the machine and injure a worker in its vicinity. At least five incidents had been recorded in which shafts had been thrown from the machine.[4] The first incident occurred in August 1976, when the driver dog was inserted backwards, causing ejection of the shaft and serious injury to the operator. The driver dogs subsequently were redesigned so that they could not be inserted backwards. No one was injured in the other incidents.
 
 
 7
 The compliance officer determined that the driver dog was inadequate to prevent flying shafts because an operator was required to use his judgment as to how tightly to adjust the screws. The effect of screws insufficiently tightened is that the driver dog will not turn the shaft, causing the shaft to accelerate to the speed of the wheel and to be propelled out of the machine. The accidents that did occur, however, were due to a variety of additional malfunctions.[5]
 
 III.
 
 8
 We turn first to Carlyle's claim that the ALJ incorrectly held that Carlyle had violated 29 U.S.C. § 654(a)(2) (1976), which requires that employers comply with occupational safety and health standards promulgated by OSHA. Carlyle argues that the ALJ erroneously concluded that the general machine guarding standard, 29 C.F.R. § 1910.212(a)(1) (1981), applied, rather than § 1910.215, the standard specifically governing abrasive wheel machinery. Carlyle contends (1) that the language of § 1910.212(a)(1) is inapplicable to this type of malfunction and (2) that § 1910.215 preempts § 1910.212(a)(1).
 
 
 9
 We agree with Carlyle that § 1910.212(a)(1) is inapplicable. The language of that section does not cover the instant hazard; it requires protection, such as barrier guards, against "hazards such as those created by rotating sparks, flying chips and sparks." The ALJ apparently interpreted "flying chips" to include shafts thrown by the machine.
 
 
 10
 The Secretary argues that the phrase "such as" covers anything flying out of machines. We hold that the language cannot be stretched to that extent. "(W) here specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated." General Electric Co. v. OSHRC, 583 F.2d 61, 65 (2 Cir. 1978). In that case we held that infrequent, periodic maintenance of machinery was not equivalent to "operation" of that machinery within the meaning of the regulation under consideration.
 
 
 11
 Of course a court should give deference to an agency's reasonable interpretation of its own standards. S. J. Groves & Sons v. OSHRC, 648 F.2d 95, 97 (2 Cir. 1981). An agency does not have carte blanche, however, to interpret regulations or standards to achieve a desired result. Here, the standard is directed at the hazards attendant upon the wastage created by more normal projectiles such as flying chips and sparks, rather than abnormal projectiles such as flying workpieces.
 
 
 12
 Further support for the view that § 1910.212(a)(1) does not cover this hazard is found in the testimony of James F. VanNamee, the draftsman of § 1910.212(a) (1). He was management cochairman of the Secretary of Labor's Advisory Committee for Safety Standards and later a Commissioner of OSHRC. He testified that § 1910.212(a)(1) was not intended to apply to abrasive wheel machinery because § 1910.215 covered it. Although such testimony is not conclusive as to the Secretary's intentions-and, indeed, may be unpersuasive in other circumstances, see General Electric Co., 5 O.S.H. Cas. 1448, 1449 (BNA 1977)-like any legislative history, it is relevant to the proper interpretation of the regulation. The testimony has special probative value here because the Secretary presented no contrary legislative history and the wording of the standard, although not conclusive, is consistent with the testimony.
 
 
 13
 We decline to allow the Secretary to fill an apparent gap in the coverage of § 1910.215-which the government does not claim requires the installation of a barrier guard of the type suggested by the government-by using the general machine guarding standard, which we believe was not meant to apply to cases such as the instant one. The proper course, if the Secretary wishes to achieve that result, would be to amend § 1910.215 to require guards[6] to protect employees from the type of hazard presented here.
 
 IV.
 
 14
 Despite our conclusion that the specific duty clause does not apply, we hold that the Commission properly determined that Carlyle violated the general duty clause, 29 U.S.C. § 654(a)(1) (1976), by not eliminating the danger of shafts expelled from the grinder.
 
 
 15
 There are four requirements in order to establish a violation of the general duty clause. National Realty & Construction Co. v. OSHRC, 489 F.2d 1257, 1265, 1267 (D.C.Cir.1973). First, it must be shown that the employer failed to furnish to its employees a place of employment free of a hazard. There is no dispute here that a hazard did exist: shafts were expelled and one worker was injured. Second, the employer or the industry must recognize the hazard. Here, Carlyle knew of the expelled shafts and of the injury. Furthermore, it was an employee complaint that led OSHA to inspect in March, 1979. Third, the hazard must be causing or likely to cause death or serious physical harm. The seriousness of the injury to the employee who was struck by a shaft and the obvious danger that others may be struck by a heavy piece of metal flung at high speed from the machine leave no doubt that death or serious physical injury could result.
 
 
 16
 As for the fourth requirement to establish a violation of the general duty clause, the parties are in dispute. " '(T)he Secretary must be constrained to specify the particular steps a cited employer should have taken to avoid citation, and to demonstrate the feasibility and likely utility of those measures.' " General Electric Co. v. OSHRC, 540 F.2d 67, 69 (2 Cir. 1976), quoting National Realty & Construction Co. v. OSHRC, supra, 489 F.2d at 1268.
 
 
 17
 The Secretary argues that Carlyle's modifications of the machine subsequent to the inspection but prior to the hearing show that abatement was feasible. There was some testimony at the hearing that corrective measures were taken; specifically, a new driver dog was installed. Carlyle's attorney has stated that "(r)espondent does not attempt to deny that after the inspection and citation certain steps were taken to modify this machine and we believe that those steps may very well have contributed to making the machine safer than it already was." Carlyle's response to this is that the new driver dog design resulted in improperly produced P-eccentric shafts and thus was not feasible abatement.
 
 
 18
 We agree with Carlyle that the attempts to correct the malfunction through subsequent correction cannot be the basis for the decision. First, the ALJ never mentioned these modifications in his opinion, nor did he rely on them in any way. Second, the record discloses insufficient evidence-indeed, there is virtually none at all-about the nature of the new device. It is impossible to determine whether the device did indeed abate the problem. Nor did the Secretary argue in his brief before the ALJ that the subsequent correction abated the hazard. It is only before this Court that the Secretary first attempted to make the corrections a serious issue. Finally, the Secretary must specify the particular steps the employer should take to correct the problem. General Electric Co. v. OSHRC, supra, 540 F.2d at 69. It is not enough for the Secretary merely to cite some vague, inconclusive evidence of subsequent corrections to carry the day.
 
 
 19
 If we disagreed with the ALJ that the barrier guard proposed by the Secretary was a feasible means of abatement, the proper course would be for us to remand the case for further evidence on the feasibility of the subsequent improvements which Carlyle made. See, e.g., RMI Co. v. Secretary of Labor, 594 F.2d 566, 574 & n.26 (6 Cir. 1979) (case remanded under authority of 29 U.S.C. § 660(a) (1976) to take additional evidence on issue of economic feasibility). Since we conclude that the barrier guard is feasible, however, a remand is unnecessary.
 
 
 20
 We hold that there is substantial evidence to support the ALJ's finding that a barrier guard is a feasible means of abatement. Carlyle contends that such a guard presents a danger equal to or greater than the danger from an expelled shaft. It argues that an expelled shaft might hit the barrier guard, rebound into the grinding wheel, and cause the wheel to disintegrate and scatter metal fragments around the work area with great force.[7]
 
 
 21
 The ALJ considered the abatement issue and rejected the "greater danger" argument as "patently implausible", commenting that "the hazard of being injured by a flying chip is not as severe as being struck by a workpiece traveling at high speed."
 
 
 22
 We agree with the ALJ's conclusion which we find to be supported by substantial evidence.[8] The Secretary's proposal of putting a barrier guard on the machine need not completely solve the problem as long as it reduces the danger. See Voegele Co. v. OSHRC, 625 F.2d 1075, 1081 (3 Cir. 1980) (hazard of falling off a roof found greater than the Secretary's proposed means of abatement; the Secretary's citation therefore held proper).
 
 
 23
 There is common sense support for the ALJ's conclusion that an expelled four-and-one-half pound, twelve-inch long metal shaft creates a far greater danger and one that is more likely to be life-threatening than metal fragments strewn over the workplace.[9] The primary danger of the fragments is not their life-threatening potential but, rather, their potential for harm to the face and especially to the eyes. That danger might be largely eliminated by wearing eye goggles or face shields. Eye and face protection already is required "where machines or operations present the hazard of flying objects." 29 C.F.R. § 1910.133(a)(1) (1981).
 
 
 24
 There was evidence, conceded by Carlyle to be accurate, that the barrier guard itself would prevent many of the fragments from being strewn around the work area. In addition, it is not certain that the shaft, if expelled, would be thrown back into the wheel and shatter it. Carlyle's experts testified that they believed there was a danger that this might happen, but they did not assert that it necessarily would.[10]
 
 
 25
 We hold that there was substantial evidence to support the ALJ's conclusion that the barrier guard proposed by the Secretary would provide at least a considerably safer condition than letting the machine continue unabated.[11]
 
 
 26
 For the reasons stated, we deny the petition to review and affirm the final decision and order of the Commission on the ground that Carlyle violated the general duty clause, 29 U.S.C. § 654(a)(1) (1976).
 
 
 
 [1]
 29 U.S.C. § 666(j) (1976) in relevant part provides:
 "(A) serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment ...."
 
 
 [2]
 29 U.S.C. § 654(a) (1976) provides:
 "(a) Each employer-
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
 (2) shall comply with occupational safety and health standards promulgated under this chapter."
 
 
 [3]
 Although of less ancient and precise lineage than Norwegian Elkhounds, see N.Y. Times, Sunday, April 4, 1982, § 23, at 19, col. 1 (Conn.Ed.), these "dogs" play a crucial role in this case, as dogs not infrequently do in life itself. See United States v. Penco, 612 F.2d 19, 21 n.3 (2 Cir. 1979)
 
 
 [4]
 Carlyle asserts that five shaft ejections in three years, out of the hundreds of thousands of shafts produced in the same period, demonstrates that the risk of an accident is exceedingly small. We note, however, (1) that an employee was seriously injured by a flying shaft, and (2) that there is no requirement of a prerequisite minimum number of accidents to warrant a citation. REA Express, Inc. v. Brennan, 495 F.2d 822, 825 (2 Cir. 1974)
 
 
 [5]
 Carlyle argues that most if not all of the accidents were caused by operator error. Assuming this to be so, it would not eliminate the employer's liability. "Even if a hazard is partially caused by an employee's own conduct, the employer is responsible if he could have prevented it." Usery v. Marquette Cement Manufacturing Co., 568 F.2d 902, 910 (2 Cir. 1977). The machine here involved had a defect that caused shafts to be expelled from it. Carlyle's own witness, George Arensman, testified that he would recommend taking the machine out of service until the problem could be solved
 
 
 [6]
 In view of our holding in this respect, we need not decide whether § 1910.215 preempts § 1910.212(a)(1)
 
 
 [7]
 Although the general rule is that the Secretary has the burden of showing the feasibility of abatement and the employer has the burden of proving the "greater hazard" affirmative defense, Voegele Co. v. OSHRC, 625 F.2d 1075, 1081 (3 Cir. 1980), in the instant case both the abatement and greater hazard issues boil down to the same question. We hold that the Secretary showed that there was a feasible means of abatement
 
 
 [8]
 Whether or not we agree with the ALJ's conclusions, we are entitled-indeed required-to examine the entire record, not just the ALJ's conclusions. Marshall v. C. F. & I. Steel Corp., 576 F.2d 809, 812 (10 Cir. 1978). This we have done
 
 
 [9]
 Courts are entitled to base conclusions upon common sense where the facts so warrant. Usery v. Marquette Cement Manufacturing Co., supra, 568 F.2d at 910 (in reversing the Commission's finding in favor of the employer, held that "it scarcely requires expertise in the industry" to recognize that a certain practice was hazardous)
 
 
 [10]
 Carlyle's experts had never witnessed an exploding grinding wheel, but only had read about them in articles
 
 
 [11]
 This case is much different from that presented in Cargill, Inc. v. Nutrena Feed Division, 10 O.S.H.Rep. 1398, 1401 (BNA Feb. 26, 1982), where the employer presented unchallenged testimony, not refutable by common sense, that the Secretary's proposed means of abatement would cause consequences so adverse as to render its use infeasible, although not a complete solution for the hazard, would reduce the danger to employees