# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-1310

_____

Thomas E. Perez, Secretary, United States Department of Labor

*Petitioner*

v.

Loren Cook Company

*Respondent*

_____

Petition for Review of an Order of the
Occupational Safety & Health Review Commission

_____

Submitted: September 26, 2013
Filed: May 9, 2014

_____

Before MURPHY, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

The Secretary of the Department of Labor petitions for review of an order of the Occupational Safety & Health Review Commission. In the order, the Commission approved without comment an underlying Administrative Law Judge's decision that addressed competing interpretations of a Department of Labor safety regulation, 29 C.F.R. § 1910.212(a)(1). The ALJ rejected the Secretary's interpretation of the regulation, found the regulation inapplicable to the present facts,

and declined to address several other issues raised in an administrative hearing. Because we conclude the Secretary's interpretation of the regulation is reasonable, and because controlling Supreme Court precedent requires deference to the Secretary when the Secretary and the Commission adopt competing reasonable interpretations, we grant the petition for review.

## I. Background

Loren Cook Company ("Loren Cook") is a manufacturer of air circulating equipment. In the manufacturing process, Loren Cook uses lathes to shape metal discs—workpieces—into parts. The lathes each hold a workpiece that is heavily lubricated and rotates rapidly as a worker applies tools to bend and shape the spinning workpiece. Lathes of different sizes are used to form workpieces of different sizes. Large lathes employ barrier guards to protect workers from ejected objects. In the past, small lathes also had employed such guards. By May 2009, however, the guards had been removed from the small lathes. At that time, a twelve-pound workpiece being tooled in a small lathe broke loose, shot out, and struck a lathe operator in the head, killing him. Although the parties dispute the frequency with which similar ejections of workpieces occurred in the past, it is undisputed that prior workpiece ejections had occurred. For example, approximately two weeks prior to the incident that killed the worker, a workpiece had been ejected from a small lathe, narrowly missing a worker twenty feet away.[1]

---

[1]After the May 2009 accident that killed a worker, at least one lathe operator reattached a guard to his small lathe. A Loren Cook supervisor questioned the operator about the guard and later removed it. This guard, and other guards that previously had been used on small lathes, were purportedly removed for inspection. The guards, however, could not be located when demanded by the Secretary in this matter. The Secretary moved for sanctions alleging spoliation of evidence. The ALJ denied the motion, but stated he was "troubled by the disappearance of the guards."

After the fatal accident, the Secretary performed an investigation and charged Loren Cook with violations of multiple regulations. The Secretary eventually dropped some charges, but found seven violations of 29 C.F.R. § 1910.212(a)(1). The Secretary determined that the regulation requires lathes such as those used by Loren Cook to have guards to protect workers from ejected workpieces. The Secretary assessed a fine of $70,000 per violation, resulting in a total fine of $490,000.

Loren Cook sought review, and the ALJ held a twenty-day hearing that resulted in an extensive record. The ALJ concluded that § 1910.212(a)(1) did not apply in the context of the present case. According to the ALJ, the regulation at issue only required guards on the lathes to prevent debris or waste material from being ejected; it did not apply to guard against the ejection of the actual item being worked on, i.e., the ejection of the actual workpiece. As a result of this threshold determination, the ALJ elected not to reach several other elements of the charge and defenses to the charge, stating, "it is not necessary to address several of the issues raised at the hearing, including the feasibility of abatement, fair notice, credibility of experts, willful classification, and collateral estoppel." Finally, the ALJ denied any pending motions not previously ruled on, presumably as moot, in light of the ALJ's holding. The Commission declined further review, and the ALJ's decision became a final order of the Commission. The Secretary petitions our court for review of the Commission's final order pursuant to 29 U.S.C. § 660(b).

## II. Discussion

### A. Standard of Review

Normally, our review of a petition from a Commission order would be standard deferential review pursuant to the Administrative Procedures Act. See Omaha Paper Stock Co. v. Sec'y of Labor, 304 F.3d 779, 782 (8th Cir. 2002) ("We will uphold the

Commission's legal conclusions unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)). Here, however, the Secretary appeals as to a question of regulatory interpretation upon which the Secretary and the Commission have adopted competing positions. We address in detail below why we believe that the Secretary's interpretation of the regulation in this matter is reasonable and well supported by the plain meaning of the regulation's text. Further, we assume for the purpose of our analysis that the Commission's interpretation also is reasonable. In this situation, where the Secretary and the Commission advocate competing reasonable interpretations of the same regulation, the question we must address is whether to accord deference to the Secretary or the Commission.

Pursuant to Martin v. Occupational Safety & Health Review Commission, 499 U.S. 144 (1991), which involved this exact question, we must defer to the Secretary. See Solis v. Summit Contractors, Inc., 558 F.3d 815, 823–25 (8th Cir. 2009) (applying Martin). In Martin, the Court resolved a circuit split and held that "a reviewing court may not prefer the reasonable interpretations of the Commission to the reasonable interpretations of the Secretary[.]" 499 U.S. at 158. In reaching this conclusion, the Court addressed Congressional intent in depth and examined the specific statutory division of adjudicatory and policymaking authority between the Commission and the Secretary. Id. at 151–54. The Court emphasized that the Occupational Safety and Health Act ("OSHA") did not create a typical unitary administrative agency, but that the Commission and Secretary represented a separation of neutral, adjudicatory functions, on the one hand, from enforcement and policymaking functions, on the other. Id. at 152, 154. The Court concluded unequivocally that deference in the interpretation of regulations was owed to the Secretary rather than the Commission, stating:

> [T]he Commission is authorized to review the Secretary's interpretations only for consistency with the regulatory language and for

reasonableness. In addition, . . . Congress expressly charged the Commission with making authoritative findings of fact and with applying the Secretary's standards to those facts in making a decision. See 29 U.S.C. § 660(a) (Commission's factual findings "shall be conclusive" so long as "supported by substantial evidence"). The Commission need be viewed as possessing no more power than this in order to perform its statutory role as "neutral arbiter."

Id. at 154–55.

Martin remains good law, although several courts have recognized the limited scope of Martin's holding. For example, courts have refused to apply Martin in cases involving different agencies. See, e.g., Hinson v. Nat'l Transp. Safety Bd., 57 F.3d 1144, 1148 n.2 (D.C. Cir. 1995) (recognizing the narrow applicability of Martin and refusing to apply Martin in a case involving competing interpretations from the Federal Aviation Administration and the National Transportation Safety Board). And courts have determined that Martin was not controlling as to questions of *statutory* interpretation. See, e.g., Chao v. Occ. Safety & Health Rev. Comm'n, 540 F.3d 519, 525 (6th Cir. 2008) ("Left undecided by Martin, however, is to whom does a reviewing court defer when the Secretary and Commission offer conflicting interpretations of a provision of [OSHA]."). These refusals by other courts to expand Martin do not undercut Martin's holding because the Supreme Court in Martin defined the issue narrowly and did not purport to issue a broad ruling that might apply in other contexts or to other agencies. Martin, 499 U.S. at 157 ("We emphasize the narrowness of our holding. We deal in this case only with the division of powers between the Secretary and the Commission under the OSH Act."). In fact, the nature of the issue raised in Martin was such that courts would not expect Martin to find application except in this very specific context: Martin rested on the careful division of authority Congress set out for the Secretary and the Commission, and that division of authority likely will vary from agency to agency and statute to statute.

Our review in this matter therefore requires that we address the Secretary's interpretation of § 1910.212(a)(1) to determine whether it is a reasonable and textually supported interpretation that merits deference pursuant to Martin in the face of a competing and inconsistent interpretation by the Commission.

## B. Interpretation of 29 C.F.R. § 1910.212(a)(1)

The regulation at issue in this case provides:

> Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are--barrier guards, two-hand tripping devices, electronic safety devices, etc.

29 C.F.R. § 1910.212(a)(1).

The ALJ held that "hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks" applied only to hazards in the form of ejected debris and not ejected workpieces. The ALJ also stated that the regulation applied only to machines in the normal course of operation and that ejection of an actual workpiece could only occur in the event of a malfunction such that the regulation should not apply. The Secretary argues this same language, in particular, the language "hazards such as those created by . . . rotating parts," contains no inherent limitation to protections only against ejected debris rather than workpieces and no inherent limitation to situations involving normal machine operation rather than machine malfunctions.

In reviewing these conflicting interpretations of the regulation, we are mindful that "[a]ny interpretation of [an OSHA regulation] generally should conform to the

accepted rules of grammar." Solis, 558 F.3d at 823–24. As such, we believe that the Secretary's argument is well supported. As an initial matter, the list "point of operation, ingoing nip points, rotating parts, flying chips and sparks" is preceded by the phrase "hazards such as those created by[.]" Because the phrase preceding the list uses the term "created by," it is wholly reasonable to interpret the list as items or conditions that *cause* the hazards, rather than treating the list as a narrow and limited enumeration of actual hazards. When meaning is accorded to the phrase "created by," it becomes apparent that the potential class of hazards covered by the regulation necessarily is larger than the enumerated causes. Each cause for a hazard could give rise to several different actual hazards.

Second, because the phrase preceding the list uses the term "such as" we conclude it is reasonable to construe the list as exemplary and not exhaustive. Orion Fin. Corp. of S.D. v. Am. Foods Grp., Inc., 281 F.3d 733, 739 (8th Cir. 2002) ("An objective reader would interpret the phrase 'such as' to mean 'for example.'"); Donovan v. Anheuser-Busch, Inc., 666 F.2d 315, 327 (8th Cir. 1981) ("The phrase 'such as' is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated by the standard."). In contrast, we find little in the way of textual support for the ALJ's position that "hazards . . . created by . . . rotating parts" are only covered if the hazards at issue take the form of the specifically enumerated categories of "flying chips" and "sparks." Rather, it is reasonable to believe that the phrase "hazards . . . created by . . . rotating parts" refers to one category of covered hazard and that the phrase "hazards . . . created by . . . flying chips and sparks" refers to additional categories of covered hazards. Further, use of the phrase "such as" to set forth a non-exhaustive, exemplary list means it is reasonable to interpret the regulation as also encompassing additional categories of hazards created by other similar, but non-enumerated, types of causes. See Donovan, 666 F.2d at 327 (concluding that use of the phrase "such as" required the court to interpret an OSHA

standard as reaching beyond the enumerated items to cover other, similar items "of the kind specified").

Third, the regulation itself defines "point of operation" as "the area on a machine where work is actually performed upon the material being processed." 29 C.F.R. § 1910.212(a)(3)(I). The lathes at issue have several rotating parts, and the workpiece itself rotates in tandem with those parts when affixed to the machine—such is the essence of a lathe. Accordingly, under two grammatically simple and clear routes, the danger associated with a workpiece being ejected from the lathe is a "hazard[] such as [that] created by point of operation [or] rotating parts . . . ."

Finally, the use of the expansive language "such as" to indicate an exemplary rather than an exhaustive list comports with the undisputed purpose of the regulation: "[T]o 'assure so far as possible every working man and woman in the Nation safe and healthful working conditions.'" Donovan, 666 F.2d at 327 (quoting 29 U.S.C. § 651(b)); Arkansas-Best Freight Sys., Inc. v. Occ. Safety & Health Rev. Comm'n, 529 F.2d 649, 653–54 (8th Cir. 1976) ("The legislative decision has been made to protect the health of employees even though increased production costs may result."). The court in Donovan concluded that a "restrictive" interpretation of a term in an OSHA regulation would not be consistent with the broad and protective statutory purpose but that the regulatory interpretation "should extend to those [situations] which in the reasonable judgment of the Secretary need protection from injury by guardrails." Donovan, 666 F.2d at 327. While this broad statement of purpose is by no means conclusive, the consistency between this broad purpose and the plain text as urged by the Secretary further demonstrates the reasonableness of the Secretary's interpretation.

To reach the opposite conclusion, the ALJ relied upon a Second Circuit opinion interpreting the regulation, Carlyle Compressor Co. v. Occupational Safety & Health

Review Commission, 683 F.2d 673 (2d Cir. 1982). Loren Cook urges our court to follow Carlyle Compressor. In Carlyle, the Second Circuit addressed a similar situation involving a machine that held and rapidly rotated a shaft so that the shaft could be subjected to grinding. Id. at 674. There, the court interpreted the language of the regulation narrowly, found the regulation inapplicable to a thrown workpiece, and recognized a distinction between "normal projectiles" and "abnormal projectiles." Id. at 675 ("[T]he ALJ apparently interpreted 'flying chips' to include shafts thrown by the machine. . . . [But] [h]ere, the standard is directed at the hazards attendant upon the wastage created by more normal projectiles *such as flying chips and sparks*, rather than abnormal projectiles such *as flying workpieces*." (emphasis added)). For the reasons already stated, we do not believe this narrow interpretation is justified by the regulation's text. Further, to the extent Carlyle rested upon a distinction between normal operations and machine malfunctions, that distinction similarly enjoys no support in the regulatory text.

Even if we were to find the Carlyle analysis compelling, we note that the Second Circuit went on to find a violation of a more general duty to provide a safe working environment. Id. at 677–78. Accordingly, even though the Second Circuit interpreted § 1910.212(a)(1) in the manner adopted by the Commission in the present case, the Second Circuit ultimately found a duty to guard against thrown workpieces. As such, it may be inappropriate to rely too heavily on the Second Circuit's interpretation of § 1910.212(a)(1) in light of the fact that the court in that case actually agreed with the Secretary that the employer had, in fact, violated a duty to protect workers from thrown rotating shafts or workpieces. Id.

In further support of its position, Loren Cook offers a fair amount of briefing directed towards the absence of prior rulings specifically advancing the Secretary's current position. According to Loren Cook, the Secretary has acquiesced in the Carlyle interpretation for decades such that any other interpretation must be deemed *per se* unreasonable or must be promulgated through a rulemaking process rather

through an enforcement action. In fact, in <u>Martin</u>, the Supreme Court acknowledged that consistent application of an interpretation is "a factor bearing on the reasonableness of the Secretary's position." <u>Martin</u>, 499 U.S. at 157. The Court also stated, however, that, "the Secretary's interpretation is not undeserving of deference merely because the Secretary advances it for the first time in an administrative adjudication[, but] the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties." <u>Id.</u> at 158.

If the Secretary's purportedly new interpretation in this case were somehow extra-textual or strained, we might agree with Loren Cook and the Commission. As set forth at length above, however, it is not. The Secretary's interpretation comports with the plain language of the statute, gives effect to the language "created by," and interprets the phrase "such as" according to our normal construction of language setting forth exemplary lists. Therefore, we take the Supreme Court at its word and view consistency as "a factor" rather than—as Loren Cook advocates—a controlling factor or the only factor in assessing the reasonableness of an interpretation. In other words, even assuming Loren Cook had convincingly demonstrated the Secretary's long-term acquiescence in the <u>Carlyle</u> interpretation, the Secretary's present advocacy of a different interpretation is not impermissible or per se unreasonable, although it may "bear on the adequacy of notice to regulated parties." <u>Id.</u>

The analysis in <u>Martin</u> itself makes clear that the Secretary's understanding of the effect of an interpretation may develop over time given the Secretary's involvement with many more enforcement actions than the Commission.[2] The Court

_____

[2]The Court in <u>Martin</u> stated:

by virtue of the Secretary's statutory role as enforcer, the Secretary comes into contact with a much greater number of regulatory problems than does the Commission, which encounters only those regulatory

-10-

identified this fact as one of the Secretary's "structural advantages" over the Commission in the interpretation of regulations. <u>Id.</u> at 152. Because the Court anticipated that the Secretary may adjust its interpretation of a regulation over time, we cannot use the need for consistency to deny the Secretary this flexibility. Rather, like the Court, we believe that a general review for reasonableness and for adherence to regulatory language is sufficient to ensure that parties are not subjected to biased or abusive interpretations. <u>Id.</u> at 156 ("Congress also intended to protect regulated parties from biased interpretations of the Secretary's regulations. But this objective is achieved when the Commission, and ultimately the court of appeals, review the Secretary's interpretation to assure that it is consistent with the regulatory language and is otherwise *reasonable*.").

In conclusion, we find nothing about <u>Carlyle</u> or the Secretary's past enforcement of the regulation sufficient to demonstrate that the Secretary's current, plain language interpretation is unreasonable. As such, we must defer to the Secretary rather than the Commission.

## C. Issues Not Addressed by the ALJ

To extent Loren Cook uses these same arguments to characterize the Secretary's imposition of a fine in this case as unfair due to an absence of adequate notice regarding a "new" interpretation, we are not unsympathetic to Loren Cook's view. For the purpose of the present appeal, however, we believe Loren Cook misses the point. The majority of the issues raised below and addressed through twenty days of testimony before the ALJ have yet to be decided. The ALJ found the regulation

---

episodes resulting in contested citations. Consequently, *the Secretary is more likely to develop the expertise relevant to assessing the effect of a particular regulatory interpretation.*

499 U.S. at 152–53 (internal citation omitted) (emphasis added).

-11-

inapplicable and stopped the analysis. Loren Cook may well be correct that the Secretary's current interpretation, although textually supported, represents a change of position for the Secretary sufficient in scope to have deprived Loren Cook of the notice necessary to justify a fine of $490,000. Even if Loren Cook is correct that the Secretary's current interpretation reflects this type of change of position, however, and even if Loren Cook ultimately shows that a fine based on that change may be unfair, Loren Cook is wrong to suggest that a change of regulatory interpretation by the Secretary must be viewed as *per se* unreasonable. A steep fine for behavior consistent with an arguably longstanding interpretation from the Secretary may well be untenable. That does not mean, however, that the Secretary is barred from issuing a reasonable interpretation of a regulation to protect workers in the future. Martin, 499 U.S. at 157.

Finally, to the extent the parties direct their arguments to additional fact-intensive issues such as the technical feasibility of guards and specific past enforcement practices, none of this fact-intensive briefing matters for resolution of the narrow issues presented in this appeal.

## III. Conclusion

We grant the petition for review, reverse the order of the Commission, and remand for further proceedings consistent with this opinion.

SHEPHERD, Circuit Judge, dissenting.

The Secretary's current interpretation of 29 C.F.R. § 1910.212(a)(1) does not deserve deference, and when the regulation is viewed using the traditional tools of interpretation, the regulation does not apply to the conduct for which Loren Cook was cited. In affording the Secretary maximum interpretive flexibility, the majority relies

on an outdated and simplified notion of deference to accept a strained interpretation of section 1910.212(a)(1) that is contrary to decades of established practice and, in the process, marginalizes the importance of consistency and notice. Because I would deny the petition for review and affirm the order of the Commission, I respectfully dissent.

## I.

Applying Seminole Rock deference, we generally give the Secretary of Labor's interpretation of his own ambiguous regulations substantial deference. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-51 (1991); see also Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1339 (2013) (Scalia, J., concurring in part and dissenting in part) (noting that Seminole Rock deference is alternatively referred to as Auer deference). Though the Secretary's interpretation of an ambiguous regulation embodied in a citation typically deserves deference, Martin instructs that deference is only appropriate when the interpretation and the manner in which the interpretation is announced are reasonable. Martin, 499 U.S. at 157-58. The Martin Court explicitly noted that the Secretary's "decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties, on the quality of the Secretary's elaboration of pertinent policy considerations, and on other factors relevant to the *reasonableness* of the Secretary's exercise of delegated lawmaking powers." Id. at 158 (emphasis added) (internal quotation marks omitted). As the majority concedes, these factors, among others, may render the Secretary's position unreasonable and, therefore, undeserving of deference.

Over time, the Supreme Court has identified circumstances in which a court should not give deference to an agency's interpretation of its own regulations. For instance, deference is not appropriate when the agency's interpretation is "'plainly erroneous or inconsistent with the regulation.'" Auer v. Robbins, 519 U.S. 452, 461

(1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)). Deference should also be withheld "when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question,'" Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166 (2012) (quoting Auer, 519 U.S. at 462), which may occur when the agency's current position conflicts with prior interpretations, appears to be nothing more than a litigating position, or is a *post hoc* rationalization of prior action. Id. at 2166-67. Our circuit has developed similar guideposts; "'[d]eference is due when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency's interpretation is the result of thorough and reasoned consideration.'" Solis v. Summit Contractors, Inc., 558 F.3d 815, 823 (8th Cir. 2009) (quoting Advanta USA, Inc. v. Chao, 350 F.3d 726, 728 (8th Cir. 2003)); Advanta USA, Inc., 350 F.3d at 728 ("The DOL's interpretation is not conclusive, and we are not necessarily bound by the DOL's interpretation of the [regulation]."); Sioux Valley Hosp. v. Bowen, 792 F.2d 715, 720 (8th Cir. 1986) ("The erratic history of the labor/delivery room policy is not the kind of interpretation justifying deference to the Secretary's expertise.").

Deference is also inappropriate when an agency's new interpretation of a regulation results in unfair surprise. See Christopher, 132 S. Ct. at 2167-68. In Christopher, the Court refused to give deference to the Department of Labor's interpretation of one of its ambiguous regulations because doing so would "impose [a] potentially massive liability on [the regulated entity] for conduct that occurred well before that interpretation was announced." Id. at 2167 & n.15.[3] The Court reasoned that deference in such circumstances would result in "unfair surprise," because the agency failed to provide fair warning of the conduct that it prohibited.

---

[3]In Christopher, all of the Justices agreed that deference was inappropriate. See Christopher, 132 S. Ct. at 2175 ("I also agree that we should not give the Solicitor General's current interpretive view any especially favorable weight.") (Breyer, J., dissenting).

See id.; Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 170-71 (2007). The Court cited Martin for Martin's recognition that the "'adequacy of notice to regulated parties'" was a relevant factor to the reasonableness of an agency's interpretation. Christopher, 132 S. Ct. at 2167 (quoting Martin, 499 U.S. at 158). The governing statutes and regulations at play in Christopher provided little reason for the regulated entities to suspect that their long-standing industry practice was unlawful. Id. at 2167-68. The possibility for unfair surprise was particularly acute because the "agency's announcement of its interpretation [was] preceded by a very lengthy period of conspicuous inaction." Id. at 2168; see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 731 F.3d 1106, 1137-40 (10th Cir. 2013). As the Court noted in closing:

> It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

Christopher, 132 S. Ct. at 2168.[4]

---

[4]The majority in Christopher took note of a growing dissatisfaction with Seminole Rock deference. Concerns have been raised about Seminole Rock's consistency with separation-of-power principles, see Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1342 (2013) (Scalia, J., concurring in part and dissenting in part) ("[H]owever great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation."); see generally Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612 (1996), and the perverse incentive it provides agencies to issue ambiguous regulations, see Christopher, 132 S. Ct. at 2168 ("[T]his practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby 'frustrat[ing] the notice and predictability purposes of rulemaking.'" (second alteration in original) (quoting Talk Am., Inc. v. Mich. Bell

-15-

Under <u>Martin</u>'s "reasonableness" framework, assessed through the lens of <u>Seminole Rock</u> precedent, the Secretary's current interpretation must be assessed: (1) for its consistency with prior interpretations; (2) for the possibility that it could unfairly surprise the regulated entity; and (3) for its fidelity to the text of the regulation. The question thus becomes whether the Secretary's interpretation of section 1910.212(a)(1), announced for the first time in a citation, was reasonable. The majority says it was. For the reasons stated below, I respectfully disagree.

II.

Section 1910.212(a)(1) provides that an employer should guard its employees "in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks." The Secretary interprets workpieces being ejected from Loren Cook's lathes as a hazard "created by . . . rotating parts"; thus, within the literal scope of section 1910.212(a)(1). The majority adds a couple of additional possibilities, that the hazard was "created by . . . point of operation" and, by relying on the phrase "such as," that flying workpieces nearly three feet in diameter and weighing 12 pounds could be included in the section as an unenumerated hazard similar to those enumerated.

The Secretary's interpretation is unreasonable for three reasons. First, the Secretary has failed to show that he has consistently interpreted section 1910.212(a)(1) to apply to large objects being ejected from a lathe. Second, the Secretary's decision to announce his unprecedented interpretation in a citation that imposed a $490,000 fine constituted unfair surprise. Third, the Secretary's interpretation of section 1910.212(a)(1) strains a common-sense reading of the section.

Tele. Co., 131 S. Ct. 2254, 2266 (2011) (Scalia, J., concurring))); <u>see also</u> <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting). Some Justices have indicated that the Court is willing to take a serious look at the continued validity of the doctrine. <u>Decker</u>, 133 S. Ct. at 1338-39 (Roberts, C.J., concurring).

A.

The Secretary has failed to show that he has consistently interpreted section 1910.212(a)(1) in the manner now asserted. The Secretary concedes that he has never issued a citation quite like this one. Secretary's Reply Br. at 15. As the majority rightfully notes, this fact does not per se render the Secretary's position unreasonable. The Secretary needs flexibility to adapt regulatory language to a variety of situations, and the decision to issue a citation, which is within the Secretary's discretion, is influenced by a variety of factors. See Christopher, 132 S. Ct. at 2168; Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442, 445-46 (1977). One could conceivably see the Secretary piecing together a series of interpretations that indicate a trend toward the current interpretation. But the Secretary has failed to produce a citation, publication, or interpretation even remotely similar to the Secretary's current position. The standard interpretation letters[5] the Secretary cites merely state that section 1910.212(a)(1) should be construed broadly to address a variety of hazards. The Secretary argues that the "natural extension" of his broad interpretation means that the section should guard "against all" hazards. These interpretation letters, as vague and unhelpful as the regulation itself, only show that the Secretary has consistently failed to take his current position. With the majority so freely willing to grant substantial deference to the Secretary's interpretations announced for the first time in a citation, one wonders why the Secretary would ever provide interpretive guidance that could limit his future flexibility to construe his own ambiguous regulations. See Christopher, 132 S. Ct. at 2168 ("[The] practice [of deferring to an agency's interpretation of its own ambiguous regulations] also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit.").

---

[5]OSHA Std. Interp. 1910.212 (D.O.L.), 2008 WL 4455006 (May 16, 2008); OSHA Std. Interp. 1910.212 (D.O.L.), 2005 WL 3801510 (Feb. 8, 2005); OSHA Std. Interp. 1910 Subpart O (D.O.L.), 1990 WL 10090096 (Mar. 21, 1990).

-17-

OSHA's own current machine guarding guidance provides the following description of the hazards created by rotating parts:

> Rotating motion can be dangerous; even smooth, slowly rotating shafts can grip hair and clothing, and through minor contact force the hand and arm into a dangerous position. Injuries due to contact with rotating parts can be severe. Collars, couplings, cams, clutches, flywheels, shaft ends, spindles, meshing gears, and horizontal or vertical shafting are some examples of common rotating mechanisms which may be hazardous. The danger increases when projections such as set screws, bolts, nicks, abrasions, and projecting keys or set screws are exposed on rotating parts.

Occupational Safety and Health Administration, Machine Guarding eTools, https://www.osha.gov/SLTC/etools/machineguarding/motions_actions.html (last visited Mar. 21, 2014); see also Loren Cook's App. at 1333-35, 1427. This interpretation, which focuses on a machine's rotating part's potential to crush or pin body parts, is considerably different from the interpretation the Secretary embodied in Loren Cook's citation, which asserts that rotating parts could cause large workpieces to eject from a lathe.

To make matters worse, the Secretary's unarticulated intent to interpret section 1910.212(a)(1) to cover the hazard here runs counter to the prevailing opinion about the scope of the section.[6]   The Second Circuit in Carlyle Compressor Co. v.

---

[6]See, e.g., Long Mfg. Co., N.C. v. Occupational Safety & Health Review Comm'n, 554 F.2d 903, 908 (8th Cir. 1977) ("When the [section 1910.212] is read as a whole, it simply requires that when a machine is a source of danger to operatives at the point of operation, that point must be guarded by some appropriate means or device for the purpose of preventing any part of the body of the operator from being in the danger zone during the machine's operating cycle . . . ."); Caterpillar, Inc., 1994 CCH OSHD ¶ 42318, *1 (No. 93-373, 1994) (ALJ) ("Section 1910.212(a) . . . generally protects the operator from dangers associated with the point of operation.

Occupational Safety & Health Review Commission, 683 F.2d 673 (2d Cir. 1982), rejected the Secretary's attempt to interpret section 1910.212(a)(1) to cover large objects thrown from a spinning machine. Id. at 674-75. Although the Second Circuit acknowledged its ordinary obligation to "give deference to an agency's *reasonable* interpretation of its own standards," it reasoned that section 1910.212(a)(1) could not be "stretched" to "cover[] anything flying out of machines." Id. at 675. Even if the majority's criticism of Carlyle were valid, see majority op. at 9, the larger problem that the majority all but ignores is that the Secretary did nothing to react to the Second Circuit's unequivocal rejection of the Secretary's broad reading of section 1910.212(a)(1). Moreover, the Secretary knew how Loren Cook operated its production process. In 2004, the Secretary issued a citation to Loren Cook for violating section 1910.212 for failing to guard its semi-automatic spinning machines, which operate largely similar to the lathes at issue in this appeal. See Loren Cook Co., 21 O.S.H. Cas. (BNA) ¶ 1705 (O.S.H.R.C. June 19, 2006). The ALJ noted that "[t]he only hazard established by the Secretary [in the 2004 citation was] the point of operation hazard created by the spinning blank," and continued that "[t]he Secretary failed to show any other part of the spinning machines presented a hazard requiring guarding." Id. at *3. The focus of the Secretary's 2004 inspection was on the point of operation—consistent with its machine guarding guidance, Carlyle, and established practice—not on ejecting workpieces.

The Secretary's failure to produce any history of interpreting section 1910.212(a)(1) in the manner now asserted is aggravated when paired with the Secretary's apparent acquiescence to the Second Circuit's decision in Carlyle. The concept of acquiescence leads to the second reason why deference is inappropriate here, unfair surprise.

_____

While the type of machine covered by the standard varies widely, the basic targeted hazard does not. A machine's function and the manner in which it is operated create the hazard anticipated by the standard."), aff'd, 17 O.S.H. Cas. (BNA) ¶ 1731 (O.S.H.R.C. Sept. 4, 1996).

B.

When an agency acquiesces in an interpretation of an ambiguous regulation for an extended period of time, then changes its interpretation to sanction conduct that occurred prior to the new interpretation, "there are strong reasons" for withholding deference. See Christopher, 132 S. Ct. at 2167-69; Abercrombie & Fitch Stores, Inc., 731 F.3d at 1139-40; see also Long Island Care at Home, Ltd., 551 U.S. at 170-71 ("[A]s long as interpretive changes create no *unfair surprise* . . . the change in interpretation alone presents no separate ground for disregarding the Department's present interpretation." (emphasis added) (citation omitted)). After Carlyle, the Secretary failed to issue a single citation proclaiming his current interpretation, amend the language of the section to clarify the section's scope, or issue interpretative guidance indicating his current position. Compare Solis, 558 F.3d at 826-27 (reasoning that the Secretary's position was consistent because the Secretary continued to take a broad view of the applicable regulation despite contrary judicial decisions). Instead, much like the Department of Labor in Christopher, the Secretary appeared to agree that section 1910.212(a)(1) did not require guarding for large, unexpected objects being ejected from a machine. When "an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." Christopher, 132 S. Ct. at 2168. The Secretary's conspicuous inaction here is amplified by its history with Loren Cook, which indicates that the Secretary knew the way in which Loren Cook conducted its manufacturing operations.

The majority notes that "even assuming Loren Cook had convincingly demonstrated the Secretary's long-term acquiescence in the Carlyle interpretation, the Secretary's present advocacy of a different interpretation is not impermissible or per se unreasonable." See majority op. at 10. However, according to the Supreme Court in Christopher, if Loren Cook establishes the Secretary's acquiescence in a contrary interpretation, then the Secretary's current interpretive position does not deserve deference. See 132 S. Ct. at 2167-68. If the Secretary's position is not given

-20-

deference, then the Secretary's position may only prevail if the "traditional tools of interpretation" support the Secretary's interpretation. Id. at 2170. As the following discussion indicates, a plain reading of section 1910.212(a)(1) does not support the Secretary's interpretation. In fact, the Secretary's interpretation is so strained as to provide an alternative reason for denying deference.

## C.

The basic operative language of section 1910.212(a)(1) provides that "machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks." 29 C.F.R. § 1910.212(a)(1).

The five enumerated examples in section 1910.212(a)(1) can be roughly broken into two groups. The first group, sources or causes of hazards, covers the first three examples. The second group, by-products of machine operation, covers the final two examples. The examples in the first group, point of operation, ingoing nip points, and rotating parts, all present situations in which the movement and working of the machine creates a danger at the point of contact as the operator's body engages with the machine. The second two examples, flying chips and sparks, are by-products of the machine's routine operation, and correspondingly by-products of the first three examples. It is worth noting that the enumerated list is preceded by "such as," which indicates that the list is not exhaustive but is highly relevant to the scope of section 1910.212. See Donovan v. Anheuser-Busch, Inc., 666 F.2d 315, 327 (1981).

There are two ways that section 1910.212(a)(1) could cover ejected workpieces: (1) the ejected workpieces are hazards created by one of enumerated point of operation sources on the list; or (2) the ejected workpieces are by-product hazards not enumerated in the section and included by the section's use of "such as."

-21-

The first option fails because a plain reading of the section 1910.212(a)(1) dictates that the hazards created by "point of operation, ingoing nip points, [and] rotating parts" all relate to the operator's physical contact with the machine during the machine's operating cycle. This interpretation of the section is supported by the guarding techniques cited in the section. The Secretary's interpretation of the section takes an unduly liberal stance on what qualifies as a "hazard" "created by" the point of operation or rotating parts and stretches the section's scope too far.

Section 1910.212(a)(3)(i) defines the point of operation as "the area on a machine where work is actually performed upon the material being processed." As applied to Loren Cook's lathes, that would mean where the operator's shaping tool makes contact with the workpiece as it spins. The regulation continues that the anticipated guard "shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle." 29 C.F.R. § 1910.212(a)(3)(ii). This portion of the regulation clarifies that hazards associated with "point of operation" are hazards that arise when the operator's body parts come into close proximity with the machine during the machine's operating cycle. Section 1910.212(a)(3)(iv) provides further support for this interpretation of point of operation by listing several machines, such as shears, power presses, milling machines, and forming rolls, that require the operator's body parts to make contact with the machine's operating cycle.

Section 1910.212(a)(1)'s reference to "rotating parts" is inapplicable to the cited conduct for the same reason; the hazards contemplated are those hazards arising from the operator's contact with the machine's moving parts. The phrase "rotating parts" should be assessed with the other enumerated examples around it. See United States v. Williams, 553 U.S. 285, 294 (2008) ("In context, however, those meanings are narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated."). The hazards created by a lathe's rotating parts, much like the hazards

from point of operation and nip points, arise from contact with the lathe, for instance, the risk that the operator's clothes, limbs, or hair could be caught in the lathe. This limited interpretation is consistent with OSHA's machine guarding interpretative materials cited above. See Occupational Safety and Health Administration, Machine Guarding eTools, supra ("Rotating motion can be dangerous; even smooth, slowly rotating shafts can grip hair and clothing, and through minor contact force the hand and arm into a dangerous position."). The Secretary's hyper-literal interpretation of a hazard created by rotating parts defies logic and seems to permit section 1910.212(a)(1) to apply to virtually any situation, no matter how remote, in which a hazard can be tied to some movement on a machine. See White Indus., Inc. v. F.A.A., 692 F.2d 532, 535 (8th Cir. 1982) (rejecting an the F.A.A.'s interpretation of a regulation as being "unduly technical"). The guarding methods provided in section 1910.212(a)(1), barrier guards, two-hand tripping devices, and electronic safety devices, anticipate preventing ingress into the danger zone while with lathe is running and, thus, support Loren Cook's limited interpretation the section. These guarding devices would do little to prevent the hazard for which Loren Cook was cited in this case, the ejection of workpieces nearly three feet in diameter and weighing 12 pounds.

The second possibility fails as well, because a 12 pound ejected workpiece has a vastly different nature and quality from the two enumerated by-product hazards. The workpiece is the product itself, not an incidental by-product discharged from the lathe. Morever, the workpiece is notably larger and more significant than the two hazards enumerated (flying chips and sparks). A 12 pound workpiece shooting off of a spinning lathe creates a catastrophic hazard significantly distinguishable from the minor hazards enumerated in section 1910.212(a)(1). Because a flying 12 pound workpiece is far from being "the same kind" of hazard as those enumerated, its inclusion through the section's "such as" phrase is improper. See Donovan, 666 F.2d at 327.

I do not doubt the Secretary's expertise in workplace safety matters or his need for flexibility to construe ambiguous regulations. But, these justifications for agency deference are not frustrated by requiring the Secretary to provide some indication of his evolving view of a regulation's scope prior to issuing a citation accompanied by a substantial fine. The Supreme Court in <u>Martin</u> warned that the Secretary's decision to use a citation to announce a novel interpretation may be unreasonable and therefore undeserving of deference. The decision in <u>Christopher</u> illustrates an instance where <u>Martin</u>'s warning holds true. The Secretary's interpretation of section 1910.212(a)(1) embodied in his citation to Loren Cook presents another situation where deference is inappropriate.

## III.

Finally, as the preceding discussion indicates, when section 1910.212(a)(1) is assessed without granting the Secretary's position deference, it does not cover the conduct for which Loren Cook was cited. Accordingly, I would deny the petition for review and affirm the order of the Commission.

_____