# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1310

_____

Thomas E. Perez, Secretary, United States Department of Labor

*Petitioner*

v.

Loren Cook Company

*Respondent*

_____

Petition for Review of an Order of the
Occupational Safety & Health Review Commission

_____

Submitted: April 15, 2015
Filed: October 13, 2015

_____

Before RILEY, Chief Judge, WOLLMAN, LOKEN, MURPHY, BYE, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, SHEPHERD, and KELLY, Circuit Judges, En Banc.

_____

SHEPHERD, Circuit Judge.

Following an industrial accident, the Secretary of Labor (Secretary)[1] determined that the Loren Cook Company (Loren Cook) violated 29 C.F.R. § 1910.212(a)(1), which requires barrier guards on certain industrial equipment. The Secretary imposed a $490,000 fine against Loren Cook. An Administrative Law Judge (ALJ) rejected the Secretary's interpretation of section 1910.212(a)(1) and vacated the fine. The Occupational Safety and Health Review Commission (Commission) adopted the ALJ's decision as its own. The Secretary petitioned this court for review of the Commission's order. A divided panel of this court granted the petition for review and reversed the Commission's order. In granting Loren Cook's petition for rehearing en banc, we vacated the panel decision. We now deny the Secretary's petition for review and affirm the Commission's order.

I.

Loren Cook is an industrial manufacturer of air circulating equipment. Loren Cook uses lathes, which are industrial turning machines used to form and mold metal discs, in its manufacturing process. Lathes operate by holding heavily lubricated pieces of metal that rotate rapidly, allowing the lathe operator to apply tools to shape the metal into individual workpieces. Lathes vary in size depending on the size of the workpiece being produced. In May 2009, a Loren Cook lathe operator was killed when a 12-pound rotating metal workpiece broke free from the lathe, flew out of his machine, and struck him in the head. The lathe ejected the workpiece at a speed of 50 to 70 miles per hour and, after the workpiece struck the operator in the head, it traveled along the floor at least another 20 feet before crashing into metal shelving.

---

[1]The Secretary acts through the Occupational Safety and Health Administration (OSHA) to create and enforce workplace health and safety standards. Solis v. Summit Contractors, Inc., 558 F.3d 815, 818 (8th Cir. 2009). We refer to OSHA and the Secretary jointly as the "Secretary."

In November 2009, the Secretary conducted an investigation of the industrial accident and issued two citations against Loren Cook. Relevant to this appeal, one citation found seven violations of 29 C.F.R. § 1910.212(a)(1) for failure to employ barrier guards to protect workers from ejected workpieces. Section 1910.212(a)(1) provides:

> Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two-hand tripping devices, electronic safety devices, etc.

The Secretary determined that Loren Cook's failure to employ barrier guards to prevent the ejection of a workpiece from this kind of catastrophic breakdown of a lathe violated section 1910.212(a)(1). The Secretary assessed Loren Cook a fine of $70,000 for each violation of this section, resulting in a total fine of $490,000.

Loren Cook sought review from an ALJ, who, after conducting a 20-day hearing and compiling an extensive record, concluded that section 1910.212(a)(1) did not apply to the conduct for which the Secretary cited Loren Cook. The ALJ reasoned that section 1910.212(a)(1) focuses on point-of-contact risks and risks associated with the routine operation of lathes, such as flakes and sparks, but does not contemplate the catastrophic failure of a lathe that would result in a workpiece being thrown out of the lathe. The ALJ thus vacated the citation the Secretary issued against Loren Cook. The Commission adopted the unmodified recommendation of the ALJ. The Secretary subsequently petitioned our court for review of the Commission's final order pursuant to 29 U.S.C. § 660(b).

## II.

We review a petition seeking review of a Commission order under a deferential standard pursuant to the Administrative Procedures Act, upholding the Commission's factual findings if they are "supported by substantial evidence on the record considered as a whole," and upholding the Commission's legal conclusions "unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Solis v. Summit Contractors, Inc., 558 F.3d 815, 823 (8th Cir. 2009) (internal quotation marks omitted). The Commission adopted the ALJ's order finding section 1910.212(a)(1) does not address catastrophic failures of lathes resulting in the ejection of workpieces and instead only considers routine risks of operation. The Secretary argues this was in error because the Secretary's interpretation of its own regulation is entitled to considerable deference and the ALJ failed to afford the Secretary's interpretation such deference.

Applying Seminole Rock[2] deference, we generally afford substantial deference to the Secretary's interpretation of his own regulations. See Thomas Jefferson Univ.

---

[2]Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945) (providing framework for deference to agency regulatory interpretations). We recognize the concerns raised about Seminole Rock's consistency with separation-of-power principles, see Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1342 (2013) (Scalia, J., concurring in part and dissenting in part) ("[H]owever great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation."); see generally Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612 (1996), and the perverse incentive it provides agencies to issue ambiguous regulations, see Christopher, 132 S. Ct. at 2168 ("[T]his practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby 'frustrat[ing] the notice and predictability purposes of rulemaking.'" (second alteration in original) (quoting Talk Am., Inc. v. Mich. Bell Tele. Co., 131 S. Ct. 2254, 2266 (2011) (Scalia, J., concurring))); see also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting). Some Justices have indicated that the Court is willing to take a serious look at the continued validity of the doctrine. Decker, 133 S. Ct. at 1338-39 (Roberts, C.J., concurring).

v. Shalala, 512 U.S. 504, 512 (1994); Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-51 (1991). But deference to the Secretary's interpretation is only appropriate when both the interpretation itself and the manner in which the Secretary announces the interpretation are reasonable. See Martin, 499 U.S. at 157-58.

The Supreme Court has identified several circumstances under which a court should not afford deference to an agency's interpretation of its own regulation. First, deference to an agency's interpretation is inappropriate when the interpretation is "'plainly erroneous or inconsistent with the regulation.'" Auer v. Robbins, 519 U.S. 452, 461 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)). Second, deference is also inappropriate "when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166 (2012) (quoting Auer, 519 U.S. at 462). This may be evidenced by an agency's current position conflicting with prior interpretations, by an agency's use of the position as nothing more than a litigating position, or by the use of the interpretation as a *post hoc* rationalization for a prior action. Id. at 2166.

Finally, deference is inappropriate when an agency's new interpretation of its own regulation results in unfair surprise. Id. at 2167. In declining to afford deference to the Department of Labor's interpretation of one of its regulations, the Christopher Court noted that giving the interpretation deference would "impose potentially massive liability on [the regulated entity] for conduct that occurred well before that interpretation was announced." Id. When the relevant agency fails to provide the regulated entity with a fair warning of what conduct a regulation prohibits, allowing the agency's interpretation to prevail would result in unfair surprise. Id. The risk of unfair surprise is particularly relevant when the "agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction." Id. at 2168. As the Court noted:

It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

Id. Such a "decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties, on the quality of the Secretary's elaboration of pertinent policy considerations, and on other factors relevant to the reasonableness of the Secretary's exercise of delegated lawmaking powers." Martin, 499 U.S. at 158 (citations omitted).

Our court has also acknowledged the parameters under which we should afford an agency's interpretation deference: "[D]eference is due when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency's interpretation is the result of thorough and reasoned consideration." Solis, 558 F.3d at 823 (quoting Advanta USA, Inc. v. Chao, 350 F.3d 726, 728 (8th Cir. 2003)); see also Advanta, 350 F.3d at 728 ("The DOL's interpretation is not conclusive, and we are not necessarily bound by the DOL's interpretation of the [regulation]."); Sioux Valley Hosp. v. Bowen, 792 F.2d 715, 720 (8th Cir. 1986) ("The erratic history of the labor/delivery room policy is not the kind of interpretation justifying deference to the Secretary's expertise.").

This precedent provides the framework under which we must assess the Secretary's interpretation of section 1910.212(a)(1), evaluating the current interpretation: (1) for fidelity to the text of the regulation itself; (2) for its consistency with prior interpretations; and (3) for the possibility of unfair surprise. Under this framework, we conclude that the Secretary's interpretation of section 1910.212(a)(1) is unreasonable and thus is not entitled to deference.

A.

First, the Secretary's interpretation of section 1910.212(a)(1) strains a common-sense reading of the section. The basic operative language of the section identifies five examples of hazards the barrier guards are meant to protect a lathe operator from: "hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks." 29 C.F.R. § 1910.212(a)(1). We note that the inclusion of the words "such as" in the language of the regulation indicates this list is illustrative rather than exhaustive. See Donovan v. Anheuser-Busch, Inc., 666 F.2d 315, 327 (8th Cir. 1981). These five hazards create two distinct categories: sources or causes of the hazard (point of operation, ingoing nip points, and rotating parts) and by-products from routine operation of the machinery (flying chips and sparks).

It follows that section 1910.212(a)(1) only covers the catastrophic failure of a lathe and the ejection of a workpiece if such an event is like one of these two categories. This event is not like the first category because a plain reading of the regulation limits this category to sources of the hazard relating to the worker's point of contact with the machinery and does not encompass the ejection of a spinning workpiece. Section 1910.212(a)(3)(i) defines "point of operation" as "the area on a machine where work is actually performed upon the material being processed." And this section provides that the requisite barrier guard "shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle." 29 C.F.R. § 1910.212(a)(3)(ii). This definition of "point of operation" is further supported by section 1910.212(a)(3)(iv), which lists several machines—including shears, power presses, milling machines, and forming rolls—which all require the operators to make contact with the machine's operating cycle. In the context of the lathes employed by Loren Cook, the point of operation is where the lathe operator touches the tool to the spinning workpiece to shape the workpiece.

Further, the use of "rotating parts" in the language of section 1910.212(a)(1) does not encompass the event at issue here because the section contemplates hazards from rotating parts related to the operator's contact with the machine rather than the anomalous ejection of objects from the machine. In reaching this conclusion, we evaluate the meaning of the term "rotating parts" by considering the other enumerated examples around it. See United States v. Williams, 553 U.S. 285, 294 (2008) ("In context, however, those meanings are narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated."). The hazards that a lathe's rotating parts create—much like the hazards from point of operation and nip points—result from contact with the lathe, including the danger of an operator's clothing, limbs, or hair becoming caught in or struck by the rotating parts. This limited interpretation of rotating parts is consistent with OSHA's machine guarding interpretative guidance. See Occupational Safety and Health Administration, Machine Guarding eTools, https://www.osha.gov/SLTC/etools/machineguarding/motions_actions.html (last visited Sept. 30, 2015) ("Rotating motion can be dangerous; even smooth, slowly rotating shafts can grip hair and clothing, and through minor contact force the hand and arm into a dangerous position.").

The Secretary's hyper-literal interpretation of a hazard created by "rotating parts" defies logic and seems to permit section 1910.212(a)(1) to apply to virtually any situation, no matter how remote or atypical, in which a hazard can be tied to some movement on a machine. Cf. White Indus., Inc. v. Fed. Aviation Admin., 692 F.2d 532, 535 (8th Cir. 1982) (rejecting the FAA's interpretation of a regulation as "unduly technical"). The guarding devices section 1910.212(a)(1) enumerates—barrier guards, two-hand tripping devices, and electronic safety devices—aim to prevent ingress by the operator into the danger zone while the lathe is running. This supports Loren Cook's limited interpretation of this section. These guarding devices would do little to prevent the hazard for which the Secretary cited Loren Cook: the high-speed ejection of a workpiece nearly 3 feet in diameter and weighing 12 pounds.

This event also is not like the second category of hazards because a 12-pound ejected workpiece differs greatly both in nature and quality from a by-product hazard created by routine operation of a lathe. The enumerated by-product hazards in the regulation—flying chips and sparks—are incidental to the normal operation of a lathe, and differ markedly from the hazard created by the ejection of a 12-pound workpiece from a spinning lathe. Because these hazards differ so significantly, we cannot conclude that a 12-pound ejected workpiece is the same kind of hazard so as to be included by the regulation's use of the phrase "such as." See Donovan, 666 F.2d at 327 (explaining that the use of "such as" in regulation indicates illustrative rather than exhaustive list). We thus conclude the Secretary's interpretation does not comport with the language of the regulation itself.

B.

Second, the Secretary has failed to provide any evidence showing that he has consistently interpreted section 1910.212(a)(1) to apply to the ejection of large objects from a lathe. Although alone not dispositive, the Secretary himself concedes that he has never issued a citation like the one he issued to Loren Cook. We recognize the Secretary's need for flexibility to adapt regulatory language to a variety of situations and that a variety of factors influence his discretionary decision to issue a citation. See Christopher, 132 S. Ct. at 2168. And, in affording the Secretary this flexibility, we also recognize that the Secretary could piece together a series of interpretations that demonstrate a trend toward the current interpretation. But the Secretary has failed to produce a single citation, publication, or interpretation that could fairly be characterized as similar to the position the Secretary announced in the citation against Loren Cook.

The Secretary argues that the standard interpretation letters[3] that he cites indicate that section 1910.212(a)(1) is to be broadly construed to guard "against all" hazards and his current interpretation is simply a "natural extension" of such an interpretation. But these interpretation letters only vaguely indicate that section 1910.212(a)(1) should be construed broadly to cover a variety of hazards and only serve to underscore that the Secretary has consistently failed to take his current position. Allowing such an interpretation to prevail could create the risk that the Secretary may never provide more specific interpretative guidance so as to avoid limiting his future ability to construe his own ambiguous regulations. See Christopher, 132 S. Ct. at 2168 ("[The] practice [of deferring to an agency's interpretation of its own ambiguous regulations] also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit.").

The Secretary's own current machine guarding guidance provides the following description of the hazards created by rotating parts:

> Rotating motion can be dangerous; even smooth, slowly rotating shafts can grip hair and clothing, and through minor contact force the hand and arm into a dangerous position. Injuries due to contact with rotating parts can be severe. Collars, couplings, cams, clutches, flywheels, shaft ends, spindles, meshing gears, and horizontal or vertical shafting are some examples of common rotating mechanisms which may be hazardous. The danger increases when projections such as set screws, bolts, nicks, abrasions, and projecting keys or set screws are exposed on rotating parts.

Occupational Safety and Health Administration, Machine Guarding eTools, supra; see also Loren Cook's App. at 1333-35, 1427. This interpretation, focused on the

---

[3]OSHA Std. Interp. 1910.212 (D.O.L.), 2008 WL 4455006 (May 16, 2008); OSHA Std. Interp. 1910.212 (D.O.L.), 2005 WL 3801510 (Feb. 8, 2005); OSHA Std. Interp. 1910 Subpart O (D.O.L.), 1990 WL 10090096 (Mar. 21, 1990).

potential of a machine's intact rotating part grabbing or snagging hair or clothing and striking, crushing, or pining body parts, differs considerably from the interpretation espoused in the Secretary's citation to Loren Cook, which asserts that rotating parts could cause the ejection of a large workpiece from a lathe.

Further, the Secretary's unarticulated intent to interpret section 1910.212(a)(1) to cover the hazard of an ejected workpiece runs counter to the prevailing opinion about the scope of this section. See, e.g., Long Mfg. Co., N.C., Inc. v. Occupational Safety & Health Review Comm'n, 554 F.2d 903, 908 (8th Cir. 1977) ("When [section 1910.212(a)(1)] is read as a whole, it simply requires that when a machine is a source of danger to operatives at the point of operation, that point must be guarded by some appropriate means or device for the purpose of preventing any part of the body of the operator from being in the danger zone during the machine's operating cycle . . . ."); Caterpillar, Inc., 1994 CCH OSHD ¶ 42318, at *1 (No. 93-373, 1994) (ALJ) ("Section 1910.212(a) . . . generally protects the operator from dangers associated with the point of operation. While the type of machine covered by the standard varies widely, the basic targeted hazard does not. A machine's function and the manner in which it is operated create the hazard anticipated by the standard." (citation omitted)), aff'd, 17 BNA OSHC 1731 (No. 93-373, 1996).

The Second Circuit, in Carlyle Compressor Co. v. Occupational Safety & Health Review Commission, 683 F.2d 673 (2d Cir. 1982), rejected the Secretary's attempt to interpret section 1910.212(a)(1) to include large objects thrown from a spinning machine. Id. at 674-75. Although the Second Circuit acknowledged its obligation to "give deference to an agency's *reasonable* interpretation of its own standards," it reasoned that section 1910.212(a)(1) could not be reasonably "stretched" to "cover[] anything flying out of machines." Id. at 675. The Secretary did nothing to react to the Second Circuit's unequivocal rejection of this interpretation. Moreover, the Secretary knew how Loren Cook conducted its production process after having issued a 2004 citation to Loren Cook for violating section 1910.212 by failing to guard its semi-automatic spinning lathes, which operate similarly to the lathes at issue

here.  See Loren Cook Co., 21 BNA OSHC 1705 (No. 04-2179, 2006) (ALJ).  The ALJ noted that "[t]he only hazard established by the Secretary [in the 2004 violation] is the point of operation hazard created by the spinning blank," and continued that "[t]he Secretary failed to show any other part of the spinning machines presented a hazard requiring guarding."  Id. at *3.  The focus of the Secretary's 2004 inspection was on points of operation—consistent with its machine guarding guidance, Carlyle, and established practice—not on ejected workpieces.  Based on this evidence, we cannot conclude the Secretary's current interpretation is consistent with his prior interpretations.

C.

Finally, the Secretary's announcement of such an unprecedented interpretation in the citation against Loren Cook amounted to unfair surprise.  There are "strong reasons" for withholding deference from an agency's interpretation of an ambiguous regulation when an agency acquiesces in an interpretation for an extended period of time and then changes its interpretation to sanction conduct that occurred prior to the new interpretation.  See Christopher, 132 S. Ct. at 2167-69; see also Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 170-71 (2007) ("[A]s long as interpretive changes create no unfair surprise . . . the change in interpretation alone presents no separate ground for disregarding the Department's present interpretation.").  When "an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute."  Christopher, 132 S. Ct. at 2168.

After the Second Circuit issued its opinion in Carlyle, the Secretary failed to issue a single citation proclaiming his current interpretation, amend the language of the section to clarify the section's scope, or issue interpretative guidance indicating his current position.  Cf. Solis, 558 F.3d at 826-27 (reasoning that the Secretary's position was consistent because the Secretary continued to take a broad view of the applicable regulation despite contrary administrative decisions).  The Secretary

instead appeared to agree with the Carlyle Court that the regulation did not require machine guarding to protect operators against the risk of the unexpected ejection of large workpieces. The Secretary's "conspicuous inaction" here is only amplified by his history with Loren Cook, providing evidence that the Secretary was familiar with the manner in which Loren Cook conducted its operations, particularly with respect to the operation of its lathes. We thus conclude that the Secretary's announcement of his current interpretation in the citation he issued to Loren Cook amounted to unfair surprise.

## III.

In sum, although we recognize both the Secretary's expertise in workplace safety matters and his need for flexibility in construing ambiguous regulations, viewing the interpretation of section 1910.212(a)(1) through the lens of Seminole Rock deference requires us to conclude that this interpretation is not entitled to substantial deference. Having determined the Secretary's interpretation of section 1910.212(a)(1) is not entitled to deference, we conclude that this section does not cover the conduct for which the Secretary cited Loren Cook. For the foregoing reasons, we deny the petition for review and affirm the Commission's order. We also deny Loren Cook's pending motions to strike.

MELLOY, Circuit Judge, with whom MURPHY, BYE, and KELLY, Circuit Judges, join, dissenting.

## I. Introduction

The majority correctly notes that the Secretary's deviation from a longstanding interpretation of a regulation can be a factor in assessing the reasonableness of a new interpretation. This factor appears to enjoy the support of two rationales. First, notice concerns arise if the regulated entity is unaware of the interpretation prior to taking action (notice concerns). And second, it is possible that through the

pronouncement of a new interpretation in an administrative adjudication, the Secretary's delegatees may be skirting normal agency process and advancing an interpretation that reflects an *ad hoc* rationalization for an action or more simply does not reflect the Secretary's reasoned and considered judgment (agency-process concerns).

It does not follow, however, that we must address notice concerns through a wholesale rejection of the Secretary's new interpretation. Rather, the Secretary's interpretation may stand, and notice concerns may affect the penalty, if any, to be imposed. It also does not follow that a court should reject the new interpretation as failing to honor agency process when an administrative adjudication is a permissible vehicle for articulating an interpretation, the interpretation is consistent with the text of the regulation, and the Secretary's past interpretation is not an expressly announced position, but rather a pattern of agency inaction.

The question at the heart of this appeal is whether our court should exercise restraint and defer to the evolving views of the Secretary in this matter. The majority appears to at least partially share the view that the Secretary possesses "expertise in workplace safety matters and . . . need[s] flexibility in construing ambiguous regulations." The majority, however, goes to great lengths in an attempt to make the Secretary's clear and textually supported interpretation of the regulation appear unreasonable in order to justify a refusal to extend deference. In doing so, the majority relies heavily on materials outside the regulation—materials which may be evidence of inconsistent interpretations but which do not disprove the simple fact that the Secretary's interpretation is a straightforward and clear reading of the regulation.

Ultimately, I disagree with the majority's conclusion that its interpretation, rather than the Secretary's interpretation, is more reasonable. I also believe that, because the Secretary's interpretation enjoys substantial textual support, we should grant the agency the substantial deference it is owed in interpreting its own regulation. See Auer v. Robbins, 519 U.S. 452, 461 (1997) (holding that the Secretary's

interpretation of its "own regulations . . . is . . . controlling unless 'plainly erroneous or inconsistent with the regulation'") (quoting <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414 (1945)) (additional citation omitted).  Any notice concerns should be dealt with in terms of the penalty, if any, to be imposed and not a wholesale rejection of the Secretary's interpretation.

## II.  Background

I add upon the facts presented by the majority because I find additional facts to be material and because the ALJ failed to make certain findings that would have been material to the reasonableness of the Secretary's interpretation.  Loren Cook uses lathes of different sizes to form workpieces of different sizes.  Large lathes employ barrier guards to protect workers from ejected objects.  In the past, small lathes also employed such guards.  By May 2009, however, Loren Cook had removed guards from the small lathes.  At that time, the twelve-pound workpiece at issue broke loose, shot out, and struck a worker in the head, killing him.  Although the parties dispute the frequency with which similar ejections of workpieces occurred in the past, it is undisputed that prior workpiece ejections had occurred.  For example, approximately two weeks before the incident that killed the worker, a workpiece from a small lathe shot out and narrowly missed a worker twenty feet away.[4]

When Loren Cook sought review of the Secretary's charge, the ALJ held a twenty-day hearing that resulted in an extensive record.  The ALJ concluded that 29 C.F.R. § 1910.212(a)(1) did not apply in the context of the present case.  According

---

[4]After the May 2009 fatality, at least one lathe operator reattached a guard to his small lathe.  A Loren Cook supervisor questioned the operator about the guard and later removed it.  This guard, and other guards that previously had been used on small lathes, were purportedly removed for inspection.  The guards, however, could not be located when demanded by the Secretary in this matter.  The Secretary moved for sanctions alleging spoliation of evidence.  The ALJ denied the motion, but stated he was "troubled by the disappearance of the guards."

to the ALJ, the regulation only required guards on lathes to prevent debris or waste material from being ejected; it did not apply to guard against the ejection of the actual item being worked on, i.e., the ejection of the actual workpiece. As a result of this threshold determination, and notwithstanding the substantial record, the ALJ elected not to reach several other elements of the charge and defenses to the charge, stating, "it is not necessary to address several of the issues raised at the hearing, including *the feasibility of abatement, fair notice*, credibility of experts, willful classification, and collateral estoppel." (Emphasis added). Finally, the ALJ denied any pending motions not previously ruled on, presumably as moot, in light of the ALJ's holding. The Commission declined further review, and the ALJ's decision became a final order of the Commission. It is clear to me that, had the ALJ found the regulation to be applicable, the twenty-day hearing and the resulting record made the case fully ripe for the ALJ to rule on the issue of whether guards on small lathes would be feasible and whether fair notice concerns otherwise would have precluded the imposition of a fine. The ALJ simply chose not to address those issues.

Notwithstanding the ALJ's failure to address the issue of feasibility, the facts strongly suggest the use of barrier guards on small lathes is feasible: they were used in the past; after the fatality at least one lathe operator unilaterally reinstalled such a guard; and such guards are still in use on the larger lathes. I view these facts as militating strongly against an assumption that use of the guards might be infeasible or ineffectual.[5]

---

[5]The majority, <u>supra</u> at 9, states, "These guarding devices would do little to prevent the hazard for which the Secretary cited Loren Cook: the high speed ejection of a workpiece nearly 3 feet in diameter and weighing 12 pounds." This conclusion appears to ignore the fact that such guards on large lathes protect against the ejection of even larger workpieces. At a minimum, the majority's commentary on feasibility addresses an issue not reached by the ALJ.

III. Discussion

A. Martin

Normally, our review of a petition from a Commission order would be standard deferential review pursuant to the Administrative Procedures Act. See Omaha Paper Stock Co. v. Sec'y of Labor, 304 F.3d 779, 782 (8th Cir. 2002) ("We will uphold the Commission's legal conclusions unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A))). Here, however, the Secretary appeals as to a question of regulatory interpretation upon which the Secretary and the Commission have adopted competing positions. Assuming the competing interpretations are reasonable, we must defer to the Secretary. See Martin v. Occ. Safety & Health Review Comm'n, 499 U.S. 144, 152–53 (1991) (resolving the relative authority of the Secretary and Commission); Solis v. Summit Contractors, Inc., 558 F.3d 815, 823–25 (8th Cir. 2009) (applying Martin).

In Martin, the Court resolved a circuit split and held that "a reviewing court may not prefer the reasonable interpretations of the Commission to the reasonable interpretations of the Secretary." 499 U.S. at 158. In reaching this conclusion, the Court addressed Congressional intent in depth and examined the specific statutory division of adjudicatory and policymaking authority between the Commission and the Secretary. Id. at 151–54. The Court emphasized that the Occupational Safety and Health Act ("OSHA") did not create a typical unitary administrative agency, but that the Commission and Secretary represented a separation of neutral, adjudicatory functions, on the one hand, from enforcement and policymaking functions, on the other. Id. The Court concluded unequivocally that deference in the interpretation of regulations was owed to the Secretary rather than the Commission, stating:

> [T]he Commission is authorized to review the Secretary's interpretations only for consistency with the regulatory language and for

reasonableness. In addition, . . . Congress expressly charged the Commission with making authoritative findings of fact and with applying the Secretary's standards to those facts in making a decision. See 29 U.S.C. § 660(a) (Commission's factual findings "shall be conclusive" so long as "supported by substantial evidence"). The Commission need be viewed as possessing no more power than this in order to perform its statutory role as "neutral arbiter."

Id. at 154–55.

Martin remains good law, although several courts have recognized the limited scope of Martin's holding. For example, courts have refused to apply Martin in cases involving different agencies. See, e.g., Hinson v. Nat'l Transp. Safety Bd., 57 F.3d 1144, 1148 n.2 (D.C. Cir. 1995) (recognizing the narrow applicability of Martin and refusing to apply Martin in a case involving competing interpretations from the Federal Aviation Administration and the National Transportation Safety Board). And courts have determined that Martin was not controlling as to questions of *statutory* interpretation. See, e.g., Chao v. Occ. Safety & Health Review Comm'n, 540 F.3d 519, 525 (6th Cir. 2008) ("Left undecided by Martin, however, is to whom does a reviewing court defer when the Secretary and Commission offer conflicting interpretations of a provision of [OSHA]."). These refusals by other courts to expand Martin do not undercut Martin's holding because the Supreme Court in Martin defined the issue narrowly and did not purport to issue a broad ruling that might apply in other contexts or to other agencies. Martin, 499 U.S. at 157 ("We emphasize the narrowness of our holding. We deal in this case only with the division of powers between the Secretary and the Commission under the OSH Act."). In fact, the nature of the issue raised in Martin was such that courts would not expect Martin to find application except in this very specific context: Martin rested on the careful division of authority Congress set out for the Secretary and the Commission, and that type of division of authority likely will vary from agency to agency and statute to statute.

The analysis in <u>Martin</u> itself also makes clear that the Secretary's understanding of the effect of an interpretation may develop over time given the Secretary's involvement with many more enforcement actions than the Commission.[6] The Court identified this fact as one of the Secretary's "structural advantages" over the Commission in the interpretation of regulations. <u>Id.</u> at 152. Because the Court expressly anticipated that the Secretary may adjust its interpretation of a regulation over time, we should guard against championing the need for consistency at the expense of the Secretary's flexibility. Like the Supreme Court, I believe a general review for reasonableness and for adherence to regulatory language is strong protection against surprising, biased, or abusive interpretations. <u>See</u> <u>id.</u> at 156 ("Congress also intended to protect regulated parties from biased interpretations of the Secretary's regulations. But this objective is achieved when the Commission, and ultimately the court of appeals, review the Secretary's interpretation to assure that it is consistent with the regulatory language and is otherwise *reasonable*.").

Our review in this matter therefore requires that we address the Secretary's interpretation of § 1910.212(a)(1) to determine whether it is a reasonable and textually supported interpretation that merits deference pursuant to <u>Martin</u> in the face of a competing and inconsistent interpretation by the Commission.

---

[6]The Court in <u>Martin</u> stated:

[B]y virtue of the Secretary's statutory role as enforcer, the Secretary comes into contact with a much greater number of regulatory problems than does the Commission, which encounters only those regulatory episodes resulting in contested citations. Consequently, *the Secretary is more likely to develop the expertise relevant to assessing the effect of a particular regulatory interpretation.*

499 U.S. at 152–53 (emphasis added) (internal citation omitted).

## B. Interpretation of 29 C.F.R. § 1910.212(a)(1)

The regulation at issue provides:

> Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two-hand tripping devices, electronic safety devices, etc.

29 C.F.R. § 1910.212(a)(1).

Like the ALJ, the majority concludes that "hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks" applied only to hazards in the form of ejected debris and not ejected workpieces. The majority also concludes the regulation applies only to machines in the normal course of operation, ejection of an actual workpiece could occur only in the event of a malfunction, and therefore, the regulation should not apply. The Secretary argues this same language contains no inherent limitation to protections only against ejected debris rather than workpieces and no inherent limitation to situations involving normal machine operation rather than machine malfunctions.

In reviewing the interpretation of a regulation, meaning should be accorded to all terms, and "[a]ny interpretation of [an OSHA regulation] generally should conform to the accepted rules of grammar." Solis, 558 F.3d at 823–24. As an initial matter, the list "point of operation, ingoing nip points, rotating parts, flying chips and sparks" is preceded by the phrase "hazards such as those created by." Because the phrase preceding the list employs the term "created by," the list necessarily refers to items or conditions that *cause* the hazards, rather than merely and narrowly setting forth an enumeration of actual hazards. When meaning is accorded to the phrase "created by,"

-20-

it becomes apparent that the potential class of hazards covered by the regulation necessarily is larger than the enumerated causes. Each cause for a hazard could give rise to several different actual hazards. In conducting its analysis, the majority fails to fully account for this broad language. <u>Supra</u> at 7 (referring to the list as "five examples of hazards").

Second, because the phrase preceding the list uses the term "such as," the list is exemplary and not exhaustive. <u>Orion Fin. Corp. of S.D. v. Am. Foods Grp., Inc.</u>, 281 F.3d 733, 739 (8th Cir. 2002) ("An objective reader would interpret the phrase 'such as' to mean 'for example.'"); <u>Donovan v. Anheuser-Busch, Inc.</u>, 666 F.2d 315, 327 (8th Cir. 1981) ("The phrase 'such as' is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated by the standard."). This fact alone suggests it may be inappropriate to engage in a hypertechnical analysis as done by the majority when citing materials outside the regulation to limit the meanings of express terms and arrive at a narrow construction (and not merely to illustrate an inconsistent interpretation). <u>See</u> <u>Donovan</u>, 666 F.2d at 327 (concluding that use of the phrase "such as" required the court to interpret an OSHA standard as reaching beyond the enumerated items to cover other, similar items "of the kind specified").

Turning to the exemplar list of items set forth as nonexclusive causes for hazards, the regulation itself defines "point of operation" as "the area on a machine where work is actually performed upon the material being processed." 29 C.F.R. § 1910.212(a)(3)(i). The lathes at issue have several "rotating parts," and the workpiece itself rotates in tandem with those parts when affixed to the machine—such is the essence of a lathe. The "point of operation" is the workpiece when rotating in tandem with the lathe. Accordingly, even without reaching the reference to flying chips and sparks, there exist two grammatically simple and clear routes that support finding the regulation applicable to the present case: the danger associated with a

workpiece being ejected from the lathe is a "hazard[] such as [that] created by point of operation [or] rotating parts."

Focusing on the language "rotating parts," the majority concludes that, because a clear and undisputed danger of rotating parts is the possibility of a worker being crushed or pulled when a body part, hair, or clothing is caught on the rotating part, the term cannot also refer to danger in the form of ejected parts. To support its interpretation, the majority looks outside the regulation itself at OSHA's online interpretative guidance. This source, however, does not purport to identify an *exclusive* type of danger associated with rotating parts. Rather, as quoted by the majority, this source simply stresses that even slowly rotating parts can be dangerous. The apparent need to stress this fact indicates that the same source implicitly recognizes—or assumes the clarity of—risk associated with rapidly rotating parts. In any event, the ejection of a workpiece is merely the consequence of inadequate connections and the centrifugal force associated with rapid rotation. Under the simplest and most straightforward interpretation of the regulation itself, and without resort to sources outside the regulation, the phrase "hazards . . . created by . . . rotating parts" can refer to items ejected from a rapidly rotating lathe. Nothing about the agency's online guidance and a reference to additional risks from slowly rotating parts suggests exclusivity. And, the Secretary's broad interpretation recognizes the regulation's broadening language "such as" and "created by."

Finally, use of the expansive language "such as" to indicate an exemplary rather than an exhaustive list comports with the undisputed purpose of the regulation: "to 'assure so far as possible every working man and woman in the Nation safe and healthful working conditions.'" Donovan, 666 F.2d at 327 (quoting 29 U.S.C. § 651(b)); Arkansas-Best Freight Sys., Inc. v. Occ. Safety & Health Review Comm'n, 529 F.2d 649, 653 (8th Cir. 1976) ("The legislative decision has been made to protect the health of employees even though increased production costs may result."). The court in Donovan concluded that a "restrictive" interpretation of a term in an OSHA

regulation would not be consistent with the broad and protective statutory purpose but that the regulatory interpretation "should extend to those [situations] which in the reasonable judgment of the Secretary need protection from injury by guardrails." Donovan, 666 F.2d at 327. While this broad statement of purpose is by no means conclusive, the consistency between this broad purpose and the plain text as urged by the Secretary further demonstrates the reasonableness of the Secretary's interpretation.

To reach the opposite conclusion, the majority appears to employ three tools. First, the majority identifies an unwritten distinction within the exemplar list of items that would separate the regulation's list into distinct and mutually exclusive groups. Second, the majority identifies an unwritten distinction between protections required in common, everyday situations and protections required to guard against less common hazards. And third, the majority relies upon the Second Circuit's opinion interpreting the regulation, Carlyle Compressor Company v. Occupational Safety & Health Review Commission, 683 F.2d 673 (2d Cir. 1982).

The majority's subdivision of the regulation's list suffers from a lack of express textual support and fails to accord meaning to the regulation's use of exemplar language. The majority concludes, "These five hazards create two distinct categories: sources or causes of the hazards (point of operation, ingoing nip points, and rotating parts) and by-products from routine operation of the machinery (flying chips and sparks)." Supra, at 7. It appears the majority concludes that the express listing of "flying chips and sparks" impliedly excludes from the list any other form of ejected material even if that other ejected material is a "hazard[] . . . created by" the "point of operation, ingoing nip points, [or] rotating parts."

This reading of the enumerated list as creating mutually exclusive categories is inconsistent with the balance of text that clearly indicates the list is exemplar and nonexclusive. This distinction is also curious, not only for its absence from the actual text, but in its creation of an inherently unworkable and apparently outcome-

-23-

determinative dividing line acknowledged nowhere in the majority's opinion. There can be no dispute that the regulation requires protection against hazards such as those created by "flying chips." Certainly, then, a dividing line must exist somewhere between very small flying chips (triggering worker protection under the majority's interpretation of the regulation) and larger pieces of flying debris (conclusively precluding application of the regulation). In either case, the debris is, in fact, a portion of the blank, i.e., the workpiece. I find no actual support for any method that might be used to identify this dividing line. I certainly find no support containing sufficient nuance to define the size limit at which a "chip" no longer invokes the need for a protective device under the regulation.

Nevertheless, the majority labels the Secretary's straightforward interpretation as strained, unsupported by common sense, and hypertechnical. All of these labels ring hollow given the majority's unjustified and extra-textual division of the list into two discrete and mutually exclusive categories. In fact, I find just the opposite to be true; the majority's interpretation which requires the invocation of outside materials and a discounting of the regulation's broadening terms appears to be a hypertechnical and unnatural reading that departs from our general rules of construction.

C. <u>Carlyle</u> and the Normal Operation/Malfunction Distinction

Because the majority's interpretation enjoys little support in the actual text of the regulation, the result today would appear to rest almost entirely on the history of agency acquiescence following the <u>Carlyle</u> opinion. This inertial support, however does not speak in any way to the question of whether the Secretary's interpretation is textually sound. Moreover, even if it were appropriate to deny the Secretary flexibility and force adherence to past inaction, continued reliance on <u>Carlyle</u> is misplaced for two reasons. First, <u>Carlyle</u> is fundamentally flawed in that it rests upon an invented distinction between normal and abnormal operations and ignores the need to guard against harm arising from foreseeable and often-repeated machine

-24-

malfunctions or human errors. Second, <u>Carlyle</u> simply does not apply to the present case because the record indicates fairly clearly that the ejection of workpieces was a common occurrence at Loren Cook that cannot truthfully be labeled "abnormal."

In <u>Carlyle</u>, the Second Circuit addressed a situation involving a machine that held and rapidly rotated a shaft so that the shaft could be subjected to grinding. 683 F.2d at 674. There, the court interpreted the language of the regulation narrowly, found the regulation inapplicable to a thrown workpiece, and recognized a distinction between "normal projectiles" and "abnormal projectiles." <u>Id.</u> at 675 ("The ALJ apparently interpreted 'flying chips' to include shafts thrown by the machine. . . . [But h]ere, the standard is directed at the hazards attendant upon the wastage created by more normal projectiles *such as flying chips and sparks*, rather than abnormal projectiles such as flying workpieces." (emphasis added)). The Court in <u>Carlyle</u>, nevertheless, found that the absence of a machine guarding device comprised a violation of a more general regulatory section regarding unsafe working conditions. <u>See id.</u> at 676 ("Despite our conclusion that the specific duty clause does not apply, we hold that the Commission properly determined that Carlyle violated the general duty clause, 29 U.S.C. § 654(a)(1) (1976), by not eliminating the danger of shafts expelled from the grinder.").

In reaching a narrow and limited interpretation of the regulation, the <u>Carlyle</u> court rested its analysis upon an invented distinction between normal operations on the one hand (producing normal projectiles), and abnormal situations or machine malfunctions, on the other (producing abnormal projectiles). This distinction not only lacks support in the regulation's text, it fails to comport with the common sense need for protection from machine malfunction, unsafe operating practices, operator error, or inadvertent mistake—often the primary sources of risk in the workplace. <u>See</u> <u>Signode Corp.</u>, 4 BNA OSCH 1078, *2 (No. 3527, 1967) ("One purpose of the Act is to prevent accidents. . . . Although there is little chance of an injury if the machines are operated properly, the standard is plainly intended to eliminate danger

from unsafe operating procedures, poor training, or employee inadvertence." (internal citations omitted)); see also Donovan, 666 F.2d at 327–28 (addressing a regulation requiring railings on "platforms" and rejecting a limiting interpretation that would have excluded from coverage raised surfaces accessed by workers only on an intermittent rather than regular basis). If such a distinction were to be recognized consistently, it would beg the question of why access to confined spaces is carefully regulated or why workers at heights must wear harnesses. Walls collapse, workers fall, and workpieces fly from lathes. The purpose of OSHA is thwarted if protections extend only to workplace situations involving perfectly functioning machines and error-free workers.

Turning to the record, several employees testified as to the frequency with which the Loren Cook lathes ejected entire workpieces. While some dispute remains as to the exact percentage of workpieces ejected[7], it is undisputed that the accident resulting in the fatality was not an isolated or unexpected event. As noted, guards are still employed on the large lathes, the small lathes for years employed such guards, and at least one worker re-installed a guard on his small lathe after the fatality (before a supervisor removed the guard "for inspection" and before all such small-lathe guards disappeared). And, even Loren Cook's work instruction manual stated, "The first rule of manual spinning lathe operations is **CAUTION**. This is one of the most difficult operations performed at Loren Cook Company. <u>The very nature of manual spinning lathe equipment possesses the potential for accidents</u>." (emphasis in original).

---

[7] Police reports of employee interviews after the fatality suggested as many as 20% of workpieces detached from lathes during operation. This number seems facially suspect given the low number of actual injuries and given that the percentage would appear to be an economically infeasible amount of waste. In any event, neither party suggests the accident in this case was an isolated event.

The interpretation favored by the majority, then, enjoys historic inertia rooted in a flawed Second Circuit opinion easily distinguishable from the present case. It does not enjoy a claim to being the more reasonable interpretation of the regulation. Further, in this case, the majority employs rhetorical tools to "double down" on the normal operation/malfunction distinction, repeatedly characterizing ejection of the workpiece as a "catastrophic failure" in an effort to illustrate a difference between a rotating part slipping from the lathe and some other piece of material or chip or spark being ejected from the lathe.[8]

## III.  Conclusion

Because <u>Martin</u> makes clear the Secretary is specifically qualified and empowered to amend its own interpretations over time, I believe it is important to guard against an overeagerness to declare a new interpretation unreasonable. In <u>Martin</u> itself, the Supreme Court acknowledged that consistent application of an interpretation is "a factor bearing on the reasonableness of the Secretary's position." <u>Martin</u>, 499 U.S. at 157. And, I do not deny that the Secretary's failure to put forth the present interpretation earlier or in a different format creates notice concerns. <u>Id.</u> at 158 ("[T]he Secretary's interpretation is not undeserving of deference merely because the Secretary advances it for the first time in an administrative adjudication[,

---

[8]The consequences of the ejection of the workpiece in this case were, no doubt, catastrophic. The majority's characterization of a workpiece ejection itself as catastrophic, however, suggests the ejection of a workpiece is somehow an isolated or highly unusual event that renders the lathe unusable. The facts as referenced above demonstrate otherwise and suggest appropriate labeling for the different types of ejected materials might be "commonly ejected materials" and "less commonly ejected materials." In any event, the choice of the language "catastrophic" to distinguish the ejection of a workpiece from the ejection of tooling shavings disregards the record regarding the potential frequency of workpiece ejections.

but] the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties.).

The question that remains, however, is how we should address the notice concerns in this case. If the Secretary's interpretation of the regulation were somehow extra-textual or strained, I likely would agree with the majority. As set forth at length above, however, the Secretary's interpretation is not strained. The Secretary's interpretation comports with the plain language of the statute, gives effect to the language "created by," and interprets the phrase "such as" according to our normal construction of language setting forth exemplary lists. It does so without confusing the process of textual analysis with the process of examining a pattern of prior interpretations. Therefore, I would take the Supreme Court at its word and view consistency with past practice and interpretation as "a factor" rather than—as the majority advocates—the controlling factor or the only factor in assessing the reasonableness of an interpretation. In other words, the Secretary's present advocacy of a different interpretation is not impermissible or per se unreasonable, although it may "bear on the adequacy of notice to regulated parties." Id.

In conclusion, I find nothing about Carlyle or the Secretary's past enforcement of the regulation sufficient to demonstrate that the Secretary's current, plain-language interpretation is unreasonable. As such, I would defer to the Secretary rather than the Commission, allow the Secretary's interpretation to stand, and address notice concerns on remand.

I would grant the petition for review, reverse the order of the Commission, and remand for further proceedings consistent with this opinion.

_____